IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: | ) |
| 331 PARTNERS, LLC, | ) |
| Debtor. | ) |
| | ) |
| THOMAS DAAKE AND | ) |
| ADELE DAAKE, | ) |
| Appellants, | ) |
| v. | ) CIVIL NO. 11-00049-CG-C |
| 331 PARTNERS, LLC, | ) |
| Appellee. | ) |

## ORDER

This is an appeal arising from the Chapter 11 bankruptcy proceeding of Appellee, 331 Partners, LLC ("331 Partners"). Appellants, Thomas and Adele Daake seek review of three orders entered by the bankruptcy court. At issue is whether the bankruptcy court erred in sustaining the objections of 331 to the claim submitted by the Daakes. This court finds the decisions of the bankruptcy court are due to be **AFFIRMED.**

### Facts[1]

331 Partners is an Alabama corporation formed by Bill Clay on June 14,

---

[1] These facts are taken, essentially verbatim, from the bankruptcy court's order sustaining objection to claim, as the Daakes have not raised any specific objections to the bankruptcy court's findings of fact.

1

2004, for the purpose of acquiring Sandestin parcel number 331 in Sandestin, Florida. Parcel 331 was the only remaining tract of undeveloped single-family use property in the Sandestin resort. On June 15, 2004, 331 Partners signed a contract with Intrawest, developer of Sandestin resort, providing for the purchase of parcel 331 for $13,945,100.00. On June 24, 2004, IPC Industries ("IPC") acquired a two-thirds ownership interest in 331 Partners and Bill Clay retained a one-third ownership interest. Initially, both Bill Clay and IPC were managers of 331 Partners.

After acquiring the parcel, 331 Partners drafted agreements with Boardwalk at Baytowne, LLC, which called for Clay and IPC to transfer their interests in 331 Partners to Boardwalk at Baytowne and serve as its managers. Local home builder C-D Jones, owned by Dennis, Cynthia, and Chris Jones, would be responsible under the draft agreements for building homes, supervising infrastructure, obtaining permits, providing home warranties, and managing construction budgets. In exchange, C-D Jones was to receive twenty-five percent of profits after repayment of capital contributions and loans. The arrangement between 331 Partners, Boardwalk at Baytowne, and C-D Jones fell through and the draft agreements were never executed.

On its 2004 tax returns, 331 Partners listed the value of parcel 331 as $14,112,711.00. On July 20, 2005, C-D Jones executed a Real Estate Sales Contract with 331 Partners to purchase parcel 331 for the purpose of developing the property. On November 3, 2005, C-D Jones and 331 Partners amended that contract. Under the amended contract the purchase price of the property was

2

$49,915,857.00 of which $17,800,000.00 was to be paid in cash, $16,759,475.00 was financed under a "Lot Sales Note" with a maturity date of December 31, 2006, and $15,356,382.00 was financed under a "Houses Note" with a maturity date of December 31, 2009. Upon executing the amended contract on November 3, 2005, 331 Partners conveyed the property to C-D Jones.

The sales price of parcel 331 on November 3, 2005, was substantially higher than what 331 Partners determined the property was worth at the time it completed its 2004 tax returns. 331 Partners member McGowin Patrick testified that the large increase between when the 2004 taxes were completed and when the amended contract was entered on November 3, 2005, reflected improvements in the Florida real estate market during that time period in which the Florida panhandle experienced a short period of marked improvement a few months after Hurricane Katrina had passed in August 2005, and also reflected the demand for the last remaining property inside the Sandestin Resort Community. He stated that further evidence supporting the increased value of parcel 331 could be found in appraisals done in connection with refinancing the mortgage on the property with Whitney Bank which was completed on December 4, 2004. Appraisals preceding the refinancing valued the parcel at approximately $28,000,000.00 – meaning the value of the property doubled in a matter of months soon after 331 Partners acquired it.

Under the November 3, 2005, Lot Sales Note, payments were due upon the sale of any lot in the subdivision equal to the greater of 80.25% of the gross sales price or the applicable minimum release price, and interest was due upon the sales of lots computed based on the outstanding principal balance. The Lot Sales Note

3

was secured by a first mortgage on all unsold lots.  Under the Houses Note, principal payments were due upon the receipt of any construction proceeds in the amount of 25.20% of the gross construction proceeds and interest was to be paid quarterly in arrears computed on the then outstanding principal balance.  The Houses Note was secured by a collateral assignment of all building contracts between C-D Jones and the lot buyers.

On November 3, 2005, 331 Partners and C-D Jones also executed an Assignment of Purchase Documents setting forth their agreement as to representations and warranties, covenants and further assurances, event of default and remedies, expenses, notices, successors and assigns, changes in writing, governing law, and counterparts/integration.  Schedule II of that document, the Minimum Release Payments schedule, listed sixty-five lots to be sold by C-D Jones to various buyers in closings that occurred contemporaneously with the execution of the Assignment of Purchase Documents.  The minimum release schedule prices for the lots ranged from $239,948.00 to $300,938.00.  Between the November 3, 2005, closing and March 2007, C-D Jones sold twenty-seven more lots in what ultimately became the Villa Lago development.  There were forty-four remaining unsold lots as of March 2007.

In May 2006, Dennis and Cynthia Jones sought to sell their interest in C-D Jones.  Bill Clay purchased a 50% interest in the company with Chris Jones owning the remaining 50%.  Since Bill Clay was also a member of 331 Partners, IPC amended the operating agreement of 331 Partners to remove Mr. Clay as a manager in order to avoid conflicts.  331 Partners and C-D Jones also modified the Lot Sales

and Houses Notes to add Bill Clay as a guarantor and to remove Dennis and Cynthia Jones as guarantors. On December 29, 2006, C-D Jones and 331 Partners amended the Lot Sales Note to extend the maturity date from December 31, 2006, to January 31, 2007. The parties also amended the Houses Note to extend the maturity date of the interest payment from December 31, 2006, to January 31, 2007.

On March 23, 2007, Bill Clay purchased the remaining shares of C-D Jones from Chris Jones and became the sole shareholder of C-D Jones. As a part of the share sale agreement, C-D Jones was to deliver to Chris Jones seven unencumbered lots in Villa Lago and $250,000.00. On April 3, 2007, C-D Jones, Chris Jones, Bill Clay, and 331 Partners executed the agreement in which C-D Jones conveyed seven Villa Lago lots to Chris Jones, free of 331 Partners' mortgage, as well as $250,000.00 which was labeled a "restructuring fee." That agreement states that 331 Partners released the lots to C-D Jones pursuant to a "Settlement Agreement" incorporated by reference. In the same document Chris Jones conveyed his interest in Stonegate, LLC, to Genoa Development, LLC; he resigned as managing member of Mack Bayou, LLC; he conveyed half of his interest in TRDH, LLC, to Bill Clay with the agreement that TRDH, LLC, would execute and deliver a lease to CD Jones; and he conveyed his interest in The Boardwalk at 30-A, LLC, to W. Clay Properties, LLC.

On the same day, 331 Partners and C-D Jones amended the Lot Sales Note to release Chris Jones as a guarantor and increased the amount of net sales proceeds paid to 331 Partners from lot sales to 100%. McGowin Patrick testified

5

that this benefited 331 Partners because it significantly increased the amount the company would be paid. The parties also amended the Houses Note to remove Chris Jones as a guarantor, to extend the maturity date from December 31, 2009, to December 31, 2010, and to alter the housing progress payments listed in Schedule I of the amendment by increasing the payment to 331 Partners from house sales. Additionally, 331 Partners and C-D Jones executed a Collateral Assignment Modification Agreement. After the transactions on April 3, 2007, 331 Partners retained thirty-seven lots.

During this time period C-D Jones also had contracts for other construction projects in the Genoa and Sacred Oaks subdivisions, and Boardwalk at 30-A, as well as for the construction of custom homes in addition to its project with 331 Partners. Bill Clay testified that during this time the market began to fail and construction substantially slowed on all projects, including Villa Lago.

Then, in May 2007, C-D Jones, Tracey Clay, Clay & Co., and William Clay were sued regarding the Villa Lago development in a dispute known as the "Alcan Litigation." The plaintiffs in that case alleged violations of the interstate Land Sales Disclosure Act, fraudulent misrepresentation, fraudulent suppression, fraudulent inducement, and several contract claims among other things. 331 Partners was added as a defendant in that case in February 2008. The Daakes were not a party to that litigation.

On February 1, 2008, 331 Partners declared C-D Jones in default for failure to pay under the Lot Sales and Houses Notes. Following the default, C-D Jones sole shareholder Bill Clay negotiated with IPC manager, McGowin Patrick, and on April

6

30, 2009, C-D Jones and 331 Partners executed a Loan Workout Agreement in which (1) C-D Jones agreed to complete unfinished amenities at Villa Lago (including landscaping, pool, and clubhouse) by August 10, 2009, (2) C-D Jones conveyed all remaining lots to 331 Partners in lieu of foreclosure, (3) third party litigation was settled, (4) 331 Partners agreed to allow C-D Jones to release settling plaintiffs in other litigation, (5) 331 Partners and C-D Jones agreed to mutual releases, and (6) C-D Jones agreed that it would not file a bankruptcy proceeding and in the event it did, the automatic stay would not apply to 331 Partners with regard to assets under the Lot Sales and Houses Notes.

After the execution of the Loan Workout Agreement, C-D Jones failed to meet its obligation to complete the Villa Lago amenities. The Villa Lago Homeowners Association completed the unfinished amenities and 331 Partners repaid the HOA for the cost of completing the work.

On July 30, 2009, C-D Jones filed a voluntary chapter 11 bankruptcy petition in the Northern District of Florida. In its schedules, it listed 331 Partners as a secured creditor with a contract claim for unbuilt homes and a first mortgage on thirty-seven vacant lots. 331 Partners obtained relief from the automatic stay as to assets under the Lot Sales and Houses Notes. C-D Jones' schedules also listed the Daakes as unsecured judgment creditors.

The Daakes' judgment against C-D Jones originated in January 2004 when

the Daakes sued C-D Jones[2] on breach of contract, building code violation, and fraud claims in Walton County, Florida, Circuit Court. The Daakes had a home construction contract with C-D Jones as to property unrelated to the Villa Lago project, and the Daakes contract with C-D Jones predated the existence of 331 Partners. The Daakes' claims against C-D Jones and its co-defendant, A.F.A.B. Contractors, Inc., were tried by jury from June 22, 2009, through July 2, 2009. The jury returned a verdict in favor of the Daakes and awarded them a total judgment of $5,196,707.67 (with a statutory interest rate of 8%). The Daakes filed a proof of claim in the C-D Jones bankruptcy on October 20, 2009 in the amount of $6,127,273.01.

On January 26, 2010, a jury returned a $1,625,538.44 judgment in favor of the plaintiffs in the Alcan litigation. 331 Partners filed its own voluntary chapter 11 petition on February 27, 2010. Russell Myles, one of the Alcan litigation plaintiffs, filed an adversary proceeding against 331 Partners on June 7, 2010 objecting to discharge under 11 U.S.C. § 523(a)(2)(A) and § 727(a)(4) and/or 11 U.S.C. § 1141. The Daakes filed a proof of claim in 331 Partners' bankruptcy on August 18, 2010. Attached to their proof of claim was the final judgment they received in Walton County, Florida, against C-D Jones. On October 14, 2010, the Daakes amended that claim to $6,333,453.73 to include attorneys' fees, costs, and post judgment interest. On August 31, 2010, 331 Partners filed an objection to the

---

[2] That case actually began with a complaint filed by C-D Jones for breach of contract and to foreclose on a construction lien. The Daakes' claims were raised in a counterclaim to that complaint.

Daakes' claim. On September 10, 2010, the Daakes filed an emergency motion to allow claim, arguing that 331 Partners is an alter ego of and a joint venture partner with C-D Jones, and is therefore liable for their claim. On September 21, 2010, 331 Partners filed their second amended Chapter 11 plan which proposed that the Daakes' claim not be paid.

The bankruptcy court held a day-long hearing on the 331 Partners' claim objection on October 18, 2010, and took the matter under advisement. On October 19, 2010, the bankruptcy court held a hearing on the confirmation of 331 Partners' second amended Chapter 11 plan. The only unresolved objection to confirmation came from the Daakes. Because it was dependent upon the resolution of the Daakes' claim, confirmation was taken under advisement by the bankruptcy court. The Daakes were also given two weeks to obtain the deposition of Chris Jones in pursuit of their claim.

Chris Jones' deposition was not taken, and on November 9, 2010 the bankruptcy court entered an order sustaining 331 Partners' objection to claim. (Doc. 267). That same day the bankruptcy court overruled the Daakes' objection and confirmed 331 Partners' second amended plan of reorganization. (Doc. 268). On November 24, 2010 the bankruptcy court entered a supplemental order confirming a modified and restated second amended plan of reorganization, which incorporated minor changes in the plan agreed to at the confirmation hearing. (Doc. 278). These three orders form the basis of this appeal.

## Discussion

### I Standard of Review

When this court sits in its capacity as an appellate court in review of the orders of the bankruptcy court, it reviews the bankruptcy court's legal conclusions de novo. In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996). "The district court must accept the bankruptcy court's factual findings unless they are clearly erroneous, and give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses." Id. This court may not make independent factual findings. Id. The Daakes do not challenge the bankruptcy court's findings of fact, so the orders at issue will be reviewed on a de novo basis using the facts as found by the bankruptcy court. The Daakes bear the burden of persuasion to establish the validity and amount of their claim by a preponderance of the evidence. In re Winn Dixie Stores, Inc., 418 B.R. 475, 476 (Bankr. M.D. Fla. 2009).[3]

## II. Successor Liability

This appeal centers on the Daakes' argument that 331 Partners should be liable for the debts of C-D Jones. As the parties recognize, if 331 Partners is liable, then the Daakes' claim would be allowed, and 331 Partners' plan of reorganization would have to be rejected. The Daakes first argue that 331 Partners is liable under the theory of successor liability. Pursuant to that theory, under either Florida or Alabama law, the liabilities of a predecessor corporation are generally not imposed

---

3 As the bankruptcy court noted, where there is an objection to a creditor's proof of claim, the usual procedure is to have the objecting debtor present evidence to rebut the presumptive validity of that proof of claim, at which point the burden shifts to the creditor to establish its claim by a preponderance of the evidence. Winn Dixie, 418 B.R. at 476. However, where the claim is a complicated one, it is appropriate to require the creditor to present its claim first. Id.

10

upon a successor corporation.[4] Amjad Munim, M.D., P.A. v. Azar M.D., 648 So.2d 145 (Fla. Dist. Ct. App. 1994); Matrix-Churchill v. Springsteen, 461 So.2d 782, 786 (Ala. 1984). Liability will be imposed on a successor only where: "(1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor." Azar, M.D., 648 So.2d at 153-154 (citing Bernard v. Kee Mfg. Co., 409 So.2d 1047, 1049 (Fla. 1982)); Springsteen, 461 So.2d at 786.

### a. De Facto Merger

On appeal, the Daakes claim that the bankruptcy court erred when it failed to find that there was a de facto merger between 331 Partners and C-D Jones. A de factor merger occurs where one corporation is absorbed by another without formal compliance with the statutory requirements for a merger. Lab. Corp. of America. v. Professional Recovery Network, 813 So.2d 266, 270 (Fla. Dist. Ct. App. 2002). "To find a de facto merger there must be continuity of the selling corporation evidenced by the same management, personnel, assets and physical location; a continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and assumption of the liabilities." Azar M.D., 648 So.2d at 153-154; see also Springsteen, 461 So.2d at 787. "The bottom line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to another." 300 Pine Island

---

4 The law of Alabama and Florida is the same regarding successor liability, so the court need not determine which state's law applies in this case.

11

Associates, LTD v. Steven L. Cohen & Associates, P.A., 547 So.2d 255, 256 (Fla. Dist. Ct. App. 1989) (internal citation omitted).

The Daakes argue that the April 2007 transactions involving 331 Partners and C-D Jones constituted in essence a de facto merger, so that 331 Partners became the successor to C-D Jones. This court does not agree. The Daakes' claim is centered on the fact that, after the April 2007 transactions, Bill Clay was both a member of 331 Partners and the sole owner of C-D Jones. While this is certainly true, it overlooks the important fact that Clay had only a noncontrolling one-third interest in 331 Partners, and that the operating agreement of 331 Partners had been amended in May 2006 to remove Clay as a manager and name IPC as the sole manager of the company. That agreement specifically excluded Clay from any voice with respect to any transactions with C-D Jones. Accordingly, the April 2007 transactions did not result in any continuity of management between 331 Partners and C-D Jones.

Further, the Daakes presented no evidence indicating that Clay exerted any influence over the actions of 331 Partners in the April 2007 transactions, or that 331 Partners had any control over the corporate decisions of C-D Jones. The evidence that is available indicates that Clay acted in his own interests and that of C-D Jones in securing the best possible terms for himself and his now wholly owned company.

Also, after the April 2007 transactions, C-D Jones continued its own separate existence and continued doing business as a separate entity. The undisputed testimony of Clay establishes that all of C-D Jones' home construction activity

began after April 2007. In addition, C-D Jones began or continued home construction activities in at least two other developments in which 331 Partners had no interest. This is clearly inconsistent with a company in the process of ceasing its business activities or dissolving itself.

In addition, the Daakes presented no evidence that Clay received any additional stock in 331 Partners as a result of this alleged de facto merger. Throughout its dealings with C-D Jones, Clay's ownership interest in 331 Partners remained at one-third. Also, there is absolutely no evidence that 331 Partners ever agreed to assume the normal business liabilities of C-D Jones. On the contrary, the April 2007 transactions increased the liability of C-D Jones to 331 Partners by making the terms of the lot sales note and the houses note more favorable to 331 Partners. Finally, the fact that 331 Partners filed a successful foreclosure suit against C-D Jones is wholly inconsistent with the internal operations of a merged company.

The Daakes submit as the only evidence of the assumption of liability by 331 Partners the fact that 331 Partners reimbursed the Villa Lago homeowners association for its costs in completing the amenities in that development. As the bankruptcy court recognized, this is not the sort of assumption of liabilities encompassed in the case law. The type of assumption of liability that points to de facto merger is of those liabilities "ordinarily necessary for the uninterrupted continuation of the business of the predecessor." U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co., 719 F.Supp.2d 1020, 1029 (S.D. Ind. 2010) see also Hinds County, Miss., 708 F.Supp.2d 348, 363 (S.D. N.Y. 2010); State ex rel.

H.C.F., Inc. v. Ohio Bureau of Workers' Comp., 687 N.E.2d 763, 768 (Ohio 1998); Wessinger v. Vetter Corp., 685 F.Supp. 769, 773 (D. Kan. 1987).

Here the payment to the association was not necessary to the continuation of C-D Jones' business. Under the terms of the April 2009 loan workout agreement, C-D Jones no longer would own any property in Villa Lago, and would therefore have no further business interest in that development. On the other hand, reimbursement of the association was in the interest of 331 Partners. It was that company that would own a large number of properties in Villa Lago and would benefit from an increase in property values generated by the completion of the amenities. Therefore, this payment by 331 Partners is not a factor in the de facto merger calculus.

### b. Piercing the Corporate Veil

The Daakes next argue that the corporate veil of C-D Jones should be pierced and liability imposed upon 331 Partners for the debts of C-D Jones. They claim that C-D Jones was a mere instrumentality of 331 Partners and was used to perpetrate a fraud upon the Daakes. Under either Alabama or Florida law, piercing the corporate veil is not a power that is lightly exercised. Gilbert v. James Russell Motors, Inc., 812 So.2d 1269, 1273 (Ala. Civ. App. 2001); Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1120-1121 (Fla. 1984). This is because the concept of limited liability is one of the purposes for which the law created the corporation. In re Coala, Inc., 182 B.R. 887, 894 (Bankr. N.D. Ala. 1995). However, "[a] separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of

14

another or the alter ego of the person owning and controlling it." Id. "For the separate corporate existence to be disregarded under the 'instrumentality' rule, the control by the stockholders must amount to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." Id. (citing Springsteen, 461 So.2d at 788). "In order to pierce the corporate veil, the complaining party must show not only that the dominant party has complete control and domination of the subservient corporation's finances, policy, and business practices but also that it misused that control to his detriment." Id. at 895 (citing Johnston v. Green Mountain, Inc., 623 So.2d 1116, 1120 (Ala. 1993)); Sykes, 450 So.2d at 1121 (corporate veil may not be pierced absent a showing of improper conduct).

Here, there simply is no evidence of any control of C-D Jones by 331 Partners, much less complete dominion and control. Once again, the only connection is that Clay, a one-third owner of 331 Partners was the sole owner of C-D Jones. As noted above, Clay had no management authority within 331 Partners, and was specifically excluded from any influence in dealings with C-D Jones. The Daakes do not point to a single incident or transaction in which C-D Jones was not pursuing its own interests, but rather the interests of 331 Partners. The Daakes claim that control by 331 Partners is demonstrated by the terms of sales contract for the 331 parcel between it and C-D Jones. In addition to the fact that the sale occurred in 2005, well before Clay had any ownership interest in C-D Jones, this claim is incorrect for at least two reasons. First, the evidence shows that after it purchased

15

the 331 parcel in June 2004, there were efforts made by 331 Partners to reach a partnership agreement with C-D Jones whereby 331 Partners would be the developer of the parcel and C-D Jones the exclusive builder, with the parties sharing the profits from the project. The fact that this plan was rejected by C-D Jones indicates a clear lack of control by 331 Partners. Secondly, the Daakes assert that the sales price for the parcel was "absurdly high." However, they provide no facts in support of this contention. To the contrary, the evidence established at the hearing shows that the value of the parcel doubled, from approximately $14 million to $28 million, between the time when 331 Partners purchased the parcel from Intrawest to the time it secured a loan from Whitney Bank, a period of just six months. Given that, a further increase in the value of the parcel to approximately $50 million in an eleven month period is not in and of itself unreasonable. The Daakes presented no evidence that this price was out of line in the Destin, Florida real estate market of 2005.

The remainder of the Daakes' arguments are similarly just conclusory allegations with no factual support. In short, the Daakes have clearly not met their burden of establishing that the corporate veil of C-D Jones should be pierced and 331 Partners held liable for their claim.

### III. Confirmation of Plan

The Daakes contend that the bankruptcy court erred in confirming the second amended plan of reorganization and the modified and restated second amended plan of reorganization submitted by 331 Partners. They claim that the plans of reorganization were proposed in bad faith, that all impaired classes did not

16

vote in favor, and that the plans were not feasible. They also argue that the plans should not have been confirmed because they improperly include releases for non-debtor third parties who were members of 331 Partners. Though not specifically identified, this objection presumably refers to the mutual releases contemplated between 331 Partners on one hand, and IPC and its owners McGowin Patrick and Clifton Inge on the other.

As an initial matter, this court finds that the Daakes have no standing to raise these issues on appeal. This court has determined above that the Daakes' claim was properly disallowed by the bankruptcy court. Accordingly, the Daakes are not creditors and are no longer entitled to object to 331 Partners' confirmation plans.

Even if they were permitted to interpose objections to the plans, the court finds that the bankruptcy court properly overruled the Daakes' objection. With respect to the objections based on bad faith, lack of unanimous support of the impaired classes and infeasibility, these are expressly based upon the Daakes' arguments that their claim should have been allowed. Because this court has determined that their claim was properly disallowed, these arguments must fail as moot.

As to the Daakes' claim that the plans improperly include releases for IPC, Patrick and Inge, the court finds this objection not well taken. The Daakes assert that these releases were provided "without explanation or justification." This is simply incorrect. The modified and restated second amended plan provides at paragraph 5.1 that funding for the plan was to come, in part, from funds provided

by IPC.[5]  Counsel for 331 Partners represented at the confirmation hearing that the amount of IPC funding was approximately $750,000.  The releases of IPC, Patrick and Inge were to be given "[i]n consideration of and as a condition to such funding by IPC . . . ."[6]  So, to the extent that the Daakes' legal argument is correct and that these releases must play an important role in 331 Partners' plan, that standard was clearly met here.  There can be no doubt that providing a significant amount of funding is an important part of the plan.  The plan would not have been feasible without the money.

In addition, the court finds that the Daakes' argument here is misplaced. The cases they cite all concern instances in which the releases under consideration sought to protect third parties from being pursued for the bankrupt debtor's debt. In the instant case, however, the releases simply provide that 331 Partners, the debtor, may not pursue claims it may have against IPC, Patrick and Inge.  Under 11 U.S.C. § 1123(b)(3)(A), a plan of reorganization may provide for " the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The releases in question are part of just such a settlement of some of 331 Partners' claims.

Accordingly, this court finds that the bankruptcy court properly confirmed 331 Partners' second amended plan of reorganization and its modified and restated second amended plan of reorganization.

---

[5] The remaining funding was to be provided by the sale of two Villa Lago lots.
[6] The plan also included the dismissal of the appeal and adversary proceeding of Myles, and the exchange of mutual releases between IPC, Patrick, and Inge on one side, and Myles and Atchison on the other.

## CONCLUSION

For the reasons stated herein, the court finds that the orders of the U.S. Bankruptcy Court for the Southern District of Alabama, in Bankruptcy Case Number 10-846, (1) sustaining 331 Partners' objection to claim (Doc. 267); (2) overruling the Daakes' objection and confirming 331 Partners' second amended plan of reorganization (Doc. 268); and (3) confirming the modified and restated second amended plan of reorganization (Doc. 278) are hereby **AFFIRMED**.

The Daakes' request for oral argument, contained within their brief, is accordingly **DENIED AS MOOT.**

**DONE and ORDERED** this 8th day of August, 2011.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE